1  JAMES T. HANNINK (131747)
   jhannink@sdlaw.com
2  ZACH P. DOSTART (255071)
   zdostart@sdlaw.com
3  DOSTART HANNINK & COVENEY LLP
   4180 La Jolla Village Drive, Suite 530
4  La Jolla, California 92037-1474
   Tel:  858-623-4200
5  Fax: 858-623-4299

6  Attorneys for Plaintiff

7

8                  UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11 | SHANNON SMITH, individually and       CASE NO. 8:16-cv-00108 CJC (KESx)
   | on behalf of all others similarly situated,   REDACTED
12 |                                        PLAINTIFF'S MEMORANDUM OF
   |            Plaintiff,                  POINTS AND AUTHORITIES IN
13 |                                        OPPOSITION TO DEFENDANT'S
   | vs.                                    MOTION FOR SUMMARY
14 |                                        JUDGMENT
   | BLUE SHIELD OF CALIFORNIA
15 | LIFE & HEALTH INSURANCE               Date:   January 9, 2017
   | COMPANY, a California Corporation,     Time:   1:30 p.m.
16 | and DOES 1-50. inclusive,              Judge:  Hon. Cormac J. Carney
   |                                        Ctrm.:  9B
17 |            Defendants.

18

19

20

21

22

23

24

25

26

27

28

_____
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN              8:16-cv-00108 CJC (KESx)
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

                                                              **Page**

I.    INTRODUCTION ................................................................... 1

II.   FACTUAL BACKGROUND ................................................... 2

    A.   Blue Shield's Health Insurance Business ............................... 2

    B.   The Importance of Customer Retention .................................. 2

    C.   Blue Shield's "2015 Retention Customer Journey Map" ......... 3

    D.   The Role of Blue Shield's Website ........................................ 4

    E.   The "Auto-Dialer" Prerecorded Calls ................................... 5

    F.   Other Touch Points for the 2015 Retention Strategy .............. 8

    G.   PowerPoint Deck for 2015 Retention Strategy ...................... 9

III.  THE STANDARD FOR SUMMARY JUDGMENT ................. 11

IV.   BLUE SHIELD BEARS THE BURDEN OF PROOF ................ 12

V.    AT A MINIMUM, THERE IS A TRIABLE ISSUE OF FACT
ON WHETHER THE TELEPHONE CALLS
CONSTITUTED "TELEMARKETING" ................................. 12

    A.   Written Consent is Required for Telemarketing Calls ........... 12

    B.   "Telemarketing" Under the TCPA ....................................... 14

        1.   *Chesbro v. Best Buy Stores, L.P.* ............................... 14

        2.   *Golan v. Veritas Entm't, LLC* .................................. 15

    C.   Blue Shield's Case Law is Inapposite .................................. 16

    D.   A Reasonable Jury Could Find that Blue Shield Made the
Telephone Calls at Issue for the Purpose of Encouraging Plaintiff
and Other Recipients to Purchase a Health Insurance Policy
From Blue Shield ................................................................ 16

VI.   BLUE SHIELD HAS NOT ESTABLISHED THAT, AS A MATTER
OF LAW, THE CALL TO PLAINTIFF CONSTITUTED A
"HEALTH CARE" MESSAGE .............................................. 18

    A.   The Call to Plaintiff Did Not Deliver a "Health Care" Message ..... 18

    B.   There Is No Categorical "HIPAA Exemption" ...................... 19

    C.   HIPAA Regulations Regarding Use of Protected Health
Information Have No Bearing on This Case .......................... 20

VII.  BLUE SHIELD HAS NOT ESTABLISHED THAT, AS A MATTER OF LAW, THE CALL WAS MADE FOR AN "EMERGENCY PURPOSE" ..................................................................................21

VIII.  THIS COURT HAS ARTICLE III JURISDICTION .....................................23

    A.   The Invasion of a Privacy Right Resulting From a TCPA Violation Constitutes a "Concrete" Injury for Article III Standing......23

    B.   If This Court Does Lack Article III Jurisdiction, the Procedural Result Would Be Remand to State Court ...............................................25

IX.    CONCLUSION ..............................................25

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4

5
*A.D. v. Credit One Bank, N.A.,*
   2016 U.S. Dist. LEXIS 110393 (N.D. Ill. Aug. 19, 2016) .................................. 25

6

7
*Alleman v. Yellowbook,*
   2013 U.S. Dist. LEXIS 127212 (N.D. Ill. Sept. 6, 2013) ................................. 16

8

9
*Ambat v. City & County of San Francisco,*
   757 F.3d 1017 (9th Cir. 2014) ........................................................... 11

10

11
*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ..................................................................... 11

12
*Aranda v. Caribbean Cruise Line, Inc.,*
   2016 U.S. Dist. LEXIS 111828 (N.D. Ill. Aug. 23, 2016) ................................ 24

13

14
*Baird v. Sabre Inc.,*
   Case No. 2:13-cv-0999 SVW (JPR) (C.D. Cal. May 8, 2013) ............................ 17

15

16
*Booth v. Appstack, Inc.,*
   2016 U.S. Dist. LEXIS 68886 (W.D. Wash. May 25, 2016) .............................. 24

17

18
*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ..................................................................... 11

19

20
*Chesbro v. Best Buy Stores, L.P.,*
   705 F.2d 913 (9th Cir. 2012) ......................................................... 14, 15

21

22
*Cour v. Life360, Inc.,*
   2016 U.S. Dist. LEXIS 98945 (N.D. Cal. July 28, 2016) ................................ 24

23

24
*Golan v. Veritas Entm't, LLC,*
   788 F.3d 814 (8th Cir. 2015) ......................................................... 15, 16

25

26
*Grant v. Capital Mgmt. Servs., L.P.,*
   449 Fed. Appx. 598 (9th Cir. 2011) ..................................................... 12

27
*Griffith v. ContextMedia, Inc.,*
   2016 U.S. Dist. LEXIS 144653 (N.D. Ill. Oct. 19, 2016) ................................. 25

28

iii

*Hewlett v. Consol. World Travel, Inc.*,
   2016 U.S. Dist. LEXIS 112553 (E.D. Cal. Aug. 23, 2016) ................................. 24

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*,
   500 U.S. 72 (1991) ........................................................................................... 25

*Juarez v. Citibank, N.A.*,
   2016 U.S. Dist. LEXIS 118483 (N.D. Cal. Sept. 1, 2016) .................................. 25

*Kolinek v. Walgreen Co.*,
   2014 U.S. Dist. LEXIS 185000 (N.D. Ill. Aug. 11, 2014) ........................... 21, 22

*Kolinek v. Walgreen Co.*,
   311 F.R.D. 483 (N.D. Ill. 2015) ........................................................................ 1

*Krakauer v. Dish Network, L.L.C.*,
   2016 U.S. Dist. LEXIS 111090 (M.D.N.C. Aug. 5, 2016) ................................. 24

*Lavigne v. First Cmty. Bancshares, Inc.*,
   2016 U.S. Dist. LEXIS 144741 (D.N.M. Oct. 19, 2016) ............................. 24, 25

*Mey v. Got Warranty, Inc.*,
   2016 U.S. Dist. LEXIS 84972 (N.D. W. Va. June 30, 2016) .............................. 24

*Meyer v. Bebe Stores, Inc.*,
   2015 U.S. Dist. LEXIS 12060 (N.D. Cal. Feb. 2, 2015) .................................... 13

*Murphy v. Schneider Nat'l, Inc.*,
   362 F.3d 1133 (9th Cir. 2004) ......................................................................... 11

*Nationwide Life Ins. Co. v. Bankers Leasing Assn, Inc.*,
   182 F.3d 157 (2d Cir. 1999) ............................................................................ 11

*Polo v. Innoventions Int'l, LLC*,
   833 F.3d 1193 (9th Cir. 2016) ......................................................................... 25

*Roberts v. Medco Health Solutions, Inc.*,
   Case No. 4:15-cv-1368 CDP,
   2016 U.S. Dist. LEXIS 97177 (E.D. Mo. 2016) .................................... 19, 21, 22

*Rogers v. Capital One Bank (USA), N.A.*,
   2016 U.S. Dist. LEXIS 73605 (N.D. Ga. June 7, 2016) .................................... 25

iv

*Romero v. Dept. Stores Nat. Bank*,
   2016 U.S. Dist. LEXIS 110889 (S.D. Cal. Aug. 5, 2016)....................................25

*Sartin v. EKF Diagnostics, Inc.*,
   2016 U.S. Dist. LEXIS 86777 (E.D. La. July 5, 2016)........................................25

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007)...........................................................................11

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................................23, 24

*Stavrindides v. Pac. Gas & Elec. Co.*,
   2016 U.S. Dist. LEXIS 78826 (N.D. Cal. June 16, 2016)..................................12

*Tolan v. Cotton*,
   134 S. Ct. 1861 (2014) ...................................................................................11

*Ung v. Universal Acceptance Corp.*,
   2016 U.S. Dist. LEXIS 102363 (D. Minn. Aug. 3, 2016)..................................25

**Other Authorities**

28 U.S.C.
   § 1447(c)......................................................................................................25

Fair Credit Reporting Act of 1970, 15 U.S.C.
   § 1681 *et seq.*..............................................................................................24

45 C.F.R. § 160.103............................................................................*passim*

*In the Matter of Implementation of the Middle Class Tax Relief &*
   *Job Creation Act of 2012*,
   27 FCC Rcd. 13615 (2012) ...............................................................................22

*In the Matter of Rules & Regulations Implementing the*
   *Tel. Consumer Prot. Act of 1991*,
   31 FCC Rcd. 9054 (July 8, 2016)......................................................................22

*In the Matter of the Rules and Regulations Implementing the*
   *Telephone Consumer Protection Act of 1991*,
   27 FCC Rcd. 1830 (2012) ..........................................................12, 19, 20, 23

v

*In the Matter of Rules and Regulations Implementing the Telephone*
*Consumer Protection Act of 1991,*
30 FCC Rcd. 7961 (2015); FCC 15-72 ...............................................18, 19, 20, 22

*In the Matter of Rules and Regulations Implementing the*
*Telephone Consumer Protection Act of 1991,*
7 FCC Rcd. 8752 (1992) ........................................................................23

47 C.F.R. § 64.1200 .................................................................................*passim*

## I.   INTRODUCTION

After its marketing group arranged to make auto-dialed, prerecorded telephone calls to more than 300,000 people in an effort to maximize customer retention and premium revenue, Blue Shield now professes shock and dismay that it is having to defend a class action lawsuit.  Blue Shield does its best to castigate TCPA class actions in general, and this one in particular, but courts recognize that class proceedings have a way of vindicating privacy rights as individual actions never could.  *See, e.g., Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 497 (N.D. Ill. 2015) ("… the reality is that recovering so small a bounty is unlikely to incentive many individual plaintiffs to hold defendants accountable for their violations of federal law.  With the class action device, the TCPA's purpose can be realized.").

The issue here is not the optics, but the merits—whether, under the controlling legal principles, and given the factual evidence in the record, Blue Shield has established that it is entitled to judgment as a matter of law.  Plaintiff submits that summary judgment is not warranted on any of the grounds asserted.  First, the factual evidence presents a compelling case that the calls to Plaintiff and putative class members were made for the purpose of encouraging them to buy a health insurance policy from Blue Shield.  If that was indeed the purpose, then the calls constituted "telemarketing," and required the called party's "prior express written consent."  At the very least, there is a triable issue of fact on this issue.

Second, Blue Shield's argument that the calls were "health care" messages lacks legal or factual support.  The pertinent regulation requires that, to qualify as a "health care" message, a call must relate to some aspect of actual medical treatment.  Calls to encourage the purchase of an insurance policy are not within that definition.

Third, Blue Shield's argument that the calls were made for an "emergency purpose" also lacks merit.  The "emergency purpose" exception is what the name implies: for use in a true emergency.  The mere fact that an annual open enrollment period is underway does not create an emergency in any sense of the word.

1    Finally, Blue Shield's argument that Plaintiff lacks Article III standing and

2    that summary judgment should be entered as a result is wrong both substantively

3    and procedurally.  To make this argument, Blue Shield relies on two outlier cases,

4    while ignoring a very large number of post-*Spokeo* cases that hold that alleging

5    violation of a privacy right protected by the TCPA satisfies the "concrete injury"

6    element of Article III.  If there is no Article III jurisdiction, however, the result

7    would not be judgment for Blue Shield, but rather remand to state court.

8    **II.    FACTUAL BACKGROUND**

9        **A.    Blue Shield's Health Insurance Business**

10    Blue Shield is in the business of selling health insurance policies to

11    businesses and individuals.  For the year 2015, Blue Shield reported premium

12    revenue of $14.8 billion and gross profit of $2.4 billion.  *See*

13    **https://www.blueshieldca.com/bsca/about-blue-shield/corporate/financials.sp**

14    (last accessed December 12, 2016).  Blue Shield serves the individual market

15    through a business unit called "Individual and Family Plan" ("IFP").  Blue Shield's

16    IFP unit competes for customers with a number of other insurers who operate in

17    California, including Kaiser Permanente, Anthem Blue Cross, Aetna, Health Net,

18    and others.

19    Health insurance policies have an effective period of twelve months, with an

20    "open enrollment" period occurring in the Fall/Winter of each year.  *See*

21    **https://www.blueshieldca.com/bsca/about-blue-shield/health-**

22    **reform/navigating-reform/key-topics.sp#OpenEnrollment**    (last    accessed

23    December 10, 2016).  During open enrollment, policyholders may choose to either

24    renew their existing plan, purchase a different plan through the same insurer, or

25    purchase a new plan from a different insurance company.

26        **B.    The Importance of Customer Retention**

27    The fact that customers have an opportunity each year to switch insurance

28    companies generates competitive pressure to retain existing customers and acquire

2

1   new ones.  Blue Shield recognizes the importance of both customer acquisition and

2   customer retention.   Deposition of Renee Casserly ("Casserly Tr.") 44:25-46:9;

3   162:14-22 (Hannink Decl. Ex. 1 at 7-9 and 21); deposition of Angela Cheda

4   ("Cheda Tr.") 45:8-12 (Ex. 2 at 35).   (Unless otherwise noted, all exhibits are

5   attached to the Declaration of James T. Hannink, filed herewith.)  Within the IFP

6   unit, Blue Shield has separate marketing teams, one focused on acquisition and one

7   focused on retention.  *See* Deposition of Maia Pineda ("Pineda Tr.") 22:5-25 (Ex. 3

8   at 63) (in March 2015, Pineda was reassigned from the IFP acquisition team to the

9   IFP retention team).  The importance of both acquisition and retention is embedded

10  in Blue Shield's compensation structure.  For Ms. Casserly—who has oversight over

11  both acquisition (sales) and retention—40% of her compensation is dependent on

12  hitting the sales and retention goals.  Casserly Tr. 52:3-19 (Ex. 1 at 10).

13          During 2015, the IFP marketing retention team included senior managers Lisa

14  Ryan and Laura Johnson.  Reporting to them—and those with the most "hands-on"

15  involvement in the matters at issue—were three marketing professionals: Angela

16  Cheda  (Retention  Marketing  Manager,  Marketing  Strategy),  Maia  Pineda

17  (Integrated  Marketing  &  Client  Experience  Specialist),  and  Lorraine  Lewis

18  (Marketing Consultant).  Copies of the LinkedIn profiles of Ms. Cheda, Ms. Pineda,

19  and Ms. Lewis are Exhibits 4, 5, and 6, respectively; *see also* Cheda Tr. 48:13-49:7

20  (Ex. 2 at 36-37); Pineda Tr. 24:23-25:11 (Ex. 3 at 64-65); and deposition of Lorraine

21  Lewis ("Lewis Tr.") 24:22-25:12 (Ex. 7 at 95-96).  That team was assisted from

22  time to time by other Blue Shield personnel, as further described below.

23          C.    **Blue Shield's "2015 Retention Customer Journey Map"**

24          As described in Blue Shield's motion, in connection with each year's open

25  enrollment, Blue Shield is required by law to mail a renewal packet to each

26  policyholder.  Beyond that, however, purely for its own marketing retention efforts,

27  Blue Shield engages in a variety of other customer communications.

28

1    In early 2015, a Blue Shield team met to discuss the question of ██████████

2    ████████████████████████████████████████████████████████████████

3    ██████████████████████████████  Ex. 8 at 107.  Following those

4    discussions, Blue Shield personnel created a "2015 Retention Customer Journey

5    Map" ("Retention Journey Map"), which depicts in a timeline format various

6    milestones and customer communications to be undertaken during the course of the

7    year.  Ex. 8 at 109-110; Cheda Tr. 126:4-128:2 (Ex. 2 at 42-44); and Ex. 24 at 281-

8    282.  ████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████  Ex. 8 at 109-

12   110.  As additional plans were made during the year, new items were entered into

13   the Retention Journey Map.

14   **D.    The Role of Blue Shield's Website**

15   Blue Shield's website, **www.blueshieldca.com**, plays a key role for customer

16   acquisition and retention.  Blue Shield makes a concerted effort to have as many

17   customers as possible sign up for online access.  Cheda Tr. 59:17–60:13 (Ex. 2 at

18   38-39).  The website contains a "prospect portal" through which individuals who are

19   not current members can evaluate Blue Shield's offerings and, if desired, purchase a

20   health insurance policy.  Casserly Tr. 92:7-19 (Ex. 1 at 11).  The website also

21   contains a "member portal" through which a current member can log in to review

22   account information.  Casserly Tr. 92:20-22 (Ex. 1 at 11).  In addition, during open

23   enrollment, a member who is not making changes can renew directly through the

24   website.  Casserly Tr. at 139:18-140:1; 153:23-154:20 (Ex. 1 at 17-20).

25   The ability of policyholders (including those who applied through Covered

26   California) to access information about Blue Shield's plans and, if not making

27   changes, to renew through the website, was the subject of careful consideration

28   within the IFP marketing teams, and was deemed to provide competitive benefits.

4

The June 16, 2015 meeting minutes of the IFP Renew and Acquisition JAD Team describe a discussion in which the team ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████   Ex. 9 at 111-112; and Cheda Tr. 92:17-93:23 (Ex. 2 at 40-41).   Regarding the Blue Shield website, the decision was made to:

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Ex. 9 at 112 (emphasis added).

Consistent with that approach, beginning on October 1, 2015 and continuing through the end of open enrollment on January 31, 2016, Blue Shield's website featured an orange banner at the top of the home page.  *See* Stipulation Regarding Appearance of Blue Shield's Home Page (Ex. 10 at 115-134).  The banner included text stating that existing IFP customers could "Keep your current plan or check out other plan options," and also included a direct link to the Renewal Tool, which could be accessed by clicking on "See My Options."  *See* Ex. 10 at 129; and Pineda Tr. 44:19-47:10 (Ex. 3 at 66-69).

### E.    The "Auto-Dialer" Prerecorded Calls

The first reference to making the telephone calls at issue in this case appears in an email dated June 7, 2015, from Angela Cheda to Raul Guerridos.  Ms. Cheda informed Mr. Guerridos that, "We're going to want to do more auto-dialers for this OE [open enrollment].  You helped us last year, but now that you're in your new

1   role, can you still help us?"  Ex. 11 at 141.  Ms. Cheda subsequently explained that

2   her team was "thinking" about doing several auto-dialer campaigns, although

3   "nothing [is] 100% final yet."  Ex. 11 at 139.  Ms. Cheda elaborated that she was

4   considering one campaign in August/September to members who will experience a

5   rate decrease, one in October/November as a "notice that member should have

6   received their renewal packet," and "[m]aybe a couple more toward early December

7   to encourage members to use the renewal tool and actively renew."  Ex. 11 at 139.

8   Mr. Guerridos confirmed that would be manageable.  *Ibid.*

9        On July 1, 2015, Ms. Cheda provided her manager with an updated "member

10  retention journey map that plots all of our touch points."  Ex. 12 at 142; Cheda Tr.

11  43:3-8 (Ex. 2 at 34).  That July 1 version of the Retention Journey Map included an

12  entry reflecting that, in October 2015, there would be a telephone campaign for

13  "Auto-dialer follow up on renewal mailing."  Ex. 12 at 144.

14       On July 28, 2015, Maia Pineda forwarded that email chain to Althea Thigpen.

15  Ex. 11 at 138.  Two days later, on July 30, 2015, Ms. Thigpen indicated that she was

16  "starting to build out the plans for the scripts."  Ex. 11 at 138.

17       On August 10, 2015, two draft scripts were circulated for comment.  Ex. 13 at

18  145-148.  For the call at issue, the draft script was as follows:

19       Hello.  This is an important message from Blue Shield of California.
         It's time to review your 2016 plan options and see what's new.  Earlier
20       this month, we mailed you information about your 2016 plan and
         benefit changes.  It compares your current health plan to other options
21       from Blue Shield.
         <You can also find out more online at blueshieldca.com/renew.>
22
         If you have not received your information packet in the mail, please
23       call the number on the back of your member ID card.

24       We want to keep you covered.

25       Thank you.

26       Goodbye.

27  Ex. 13 at 147 (script designated as MAR 69335).

28       Several people responded with suggested edits, which were summarized in

6

1   Track Changes format.  Ex. 14 at 149; Casserly Tr. 133:4-137:16 (Ex. 1 at 12-16).

2   First, the word "health" was inserted in the second sentence.  Second, it was

3   suggested that "instead of pointing them to a URL" (*i.e.*, blueshield.com/renew),

4   "let's point them to BSCA.com home page where they will find a message/buttons

5   to get them to the member renewal tool."  Third, it was suggested that the last

6   substantive sentence, "We want to keep you covered," could be removed "if space is

7   an issue" or "if it's too long during the recording."  Ex. 14 at 149.

8        With respect to the issue of whether the script should refer recipients to the

9   Blue Shield home page or to the URL blueshield.com/renew, Ms. Cheda decided to

10  seek input from someone with more expertise about the website.  In that regard, on

11  August 18, 2015, Ms. Cheda asked Lorraine Lewis to "[t]ouch base with Christine

12  [Hernandez] … for the information about the URL.  She might have an easier way

13  to tell the member what to do since its different being that it's an auto-dialer."  Ex.

14  15 at 150.  Ms. Lewis promptly sought that input from Ms. Hernandez:

15       Hi Christine – I was asked to touch base with you to get your guidance
         on how we can incorporate some feedback from Celia Gonzalez
16       regarding the attached marketing material.  Per the attached document
         from Celia:
17
              Instead of pointing them to a URL, let's point them to
18            BSCA.com page where they will find a message/buttons to
              get them to the member renewal tool.  Please see Christine
19            Hernandez if you have questions on how this will work.

20       [C]an you assist with how this would work, i.e., how we can tell
         members what to do (since this communication will be through an Auto
21       Dialer)?

22  Ex. 16 at 158.  Ms. Hernandez did not respond quickly, and there was some concern

23  that delay could affect the project schedule.  Ex. 16 at 157.  Thus, the next morning,

24  August 19, 2015, Ms. Pineda reported to Ms. Cheda that:

25       I recommended to Lorraine yesterday that per Celia's feedback, we
         alter the url to the home page (as noted in the attached)
26
         Christine's info will just tell us that when they get to the home page,
27       there will be a banner that they can click to access the renewal tool.  I
         don't think those details should be included in the auto-dialer because
28       that will just lengthen the message.

1 | Ex. 16 at 155.

2 | Those changes were incorporated, and the script was finalized as follows:

3 | Hello.  This is an important message from Blue Shield of California. It's time to review your 2016 health plan options and see what's new.

4 |

5 | Earlier this month, we mailed you information about your 2016 plan and benefit changes.  It compares your current health plan to other options from Blue Shield.  You can also find out more online at blueshieldca.com.

6 |

7 | If you have not received your information packet in the mail, or if you have any questions, please call the number on the back of your member ID card.

8 |

9 | Thank you.

10 | Goodbye.

11 | *See* Guerridos Decl. Ex. A (Dkt. 46-4 at Page ID 959).

12 | It was not mandatory for Blue Shield to make these calls.  Cheda Tr. 126:1-

13 | 16; 129:19-131:9 (Ex. 2 at 42 and 45-47).  Before the calls were made, there was

14 | discussion about whether the call campaign should go forward.  On October 9, 2016,

15 | Ms. Casserly sent details about the campaign to Bret Balousek (VP of Consumer

16 | Experience & Operational Compliance) with the comment:  "we still have time to

17 | stop if you guys think we should not make these calls."  Casserly Decl. Ex. D (Dkt.

18 | 40-5 at Page ID 644).  Mr. Balousek responded with a question, "What is the

19 | purpose of making robo calls to these people?"  *Id.* at Page ID 643.  Trina Mallach

20 | responded that the calls were intended to "prompt people to check the mail for their

21 | packet and to *take renewal action early.*"  *Ibid.* (italics added).  The decision was

22 | made to proceed, and the message was delivered via auto-dialed, prerecorded

23 | telephone calls to Plaintiff and 300,000 other policyholders.  Ex. 17 at 164-165.

24 | **F.    Other Touch Points for the 2015 Retention Strategy**

25 | In addition to the auto-dialer campaign, Blue Shield's IFP marketing team

26 | planned and executed several other "touch points" for the retention effort, including:

27 | •    *Email reminders*:  The marketing team drafted emails to be sent to IFP

28 | customers to remind them that "open enrollment is here" and providing a link to the

8

1  "online renewal tool."  The content of those renewal emails went through a similar

2  draft/circulation/revision process described above regarding the auto-dialer scripts.

3  Ex. 18 at 167-173.

4  • *Direct mail reminders*:  For customers who did not have an email

5  address on file, the marketing team drafted a direct mail piece with similar

6  messaging, reminding them that "open enrollment is here" and providing

7  instructions to access "our smart online renewal tool" at blueshieldca.com/renew.

8  Ex. 19 at 174-177 (draft circulated for feedback on September 4, 2015).

9  • *Bill inserts*:  From September to December 2015, the marketing team

10  included messaging about open enrollment via monthly bill messages and inserts.

11  **G.  PowerPoint Deck for 2015 Retention Strategy**

12  As the year 2015 drew to a close, Ms. Cheda, with assistance from Ms. Lewis,

13  created a PowerPoint deck that summarized the retention strategy over the course of

14  the year, including the strategies executed in connection with open enrollment

15  (which was still ongoing).  Cheda Tr. 132:16-134:21 (Ex. 2 at 48-50).  ████████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ██████████████████  Ex. 20 at 206.  The objective was a 90% retention rate.

20  Ex. 20 at 185; Cheda Tr. 132:16-134:21 (Ex. 2 at 48-50).  Of the documents

21  produced to date by Blue Shield, it appears that the most complete version of the

22  2015 Retention Strategy PowerPoint deck was as of January 4, 2016.  *See* Ex. 21.[1]

23  That 2015 Retention Strategy PowerPoint deck summarizes the IFP marketing

24  _____

25  [1] Although it bears a date of January 4, 2015, the document is attached to an email
dated February 23, 2016 identifying the attachment as dated January 4, 2016.  Also,

26  it also includes a Journey Map covering the entire year of 2015, as well as dates and
figures for certain touch point activities undertaken through the end of December

27  2015.  The logical inference is that Exhibit 21 was a version dated January 4, 2016.

28

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN                    8:16-cv-00108 CJC (KESx)
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

retention strategies and activities undertaken throughout 2015, with key points that include the following:



- ███████████████████████████ (Ex. 21 at 222);

- ███████████████████████████ ██████████ (Ex. 21 at 251);

- ███████████████████████████ ████████████████████████████████ (Ex. 21 at 253);

- ███████████████████████████ ██████████████████████ (Ex. 21 at 257);

- ███████████████████████████ ██ (Ex. 21 at 268);

- ███████████████████████████ █████████ (Ex. 21 at 247);

- ███████████████████████████ ████████████ (Ex. 21 at 271).

████████████████████████████
████████████████████████████
███████████████████ Ex. 21 at 259.

The purpose of the retention campaign, including the auto-dialer messages, is perhaps best summarized in the words that Angela Cheda and Lorraine Lewis use to describe their own work: <u>Cheda</u>: "Developed integrated marketing plans for 2014 and 2015 to retain IFP membership and *drive profitable membership growth*" (Ex. 4 at 73) (italics added); <u>Lewis</u>: "Marketing Manager with responsibility for integrated marketing channels in support of open enrollment strategy, *driving member sales and profitable growth*" (Ex. 6 at 83) (italics added).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

8:16-cv-00108 CJC (KESx)

## III.   THE STANDARD FOR SUMMARY JUDGMENT

Summary judgment is a "drastic device," since it cuts off the other party's right to present its case to a jury. *Ambat v. City & County of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).  The moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Ibid.*; *Nationwide Life Ins. Co. v. Bankers Leasing Assn, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The Court must draw "all reasonable inferences [and] resolve all factual conflicts in favor of the non-moving party." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004).  A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There is no genuine issue as to any material fact when the moving party shows "a complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where, as here, the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  If the moving party meets that initial burden, the motion must be denied if the opposing party sets forth facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250.  All reasonable inferences that may be drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).

## IV.   BLUE SHIELD BEARS THE BURDEN OF PROOF

Consent is a defense to a TCPA claim.  *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. Appx. 598, 600 n.1 (9th Cir. 2011); *Stavrindides v. Pac. Gas & Elec. Co.*, 2016 U.S. Dist. LEXIS 78826, at *6-7 (N.D. Cal. June 16, 2016).

Under the TCPA, in some circumstances consent must be in writing and with particular content that satisfies 47 C.F.R. § 64.1200(f)(10), whereas in other circumstances such written consent is not required.  Here, whether Blue Shield had the requisite consent turns on several subsidiary issues, including whether the call to Plaintiff's cellular telephone constituted "telemarketing," whether the call delivered a "health care" message, and whether the call was made for an "emergency purpose."  47 C.F.R. § 64.1200(a)(2).  Because all of these issues relate to the affirmative defense of consent, Blue Shield bears the burden of proof.

## V.   AT A MINIMUM, THERE IS A TRIABLE ISSUE OF FACT ON WHETHER THE TELEPHONE CALLS CONSTITUTED "TELEMARKETING"

### A.   Written Consent is Required for Telemarketing Calls

Blue Shield spends several pages arguing that it was not required to obtain *written* consent from Plaintiff before making the call to her cellular telephone, and that the requisite consent was supplied when Plaintiff put her phone number on her application with Covered California.  Def.'s Mem. at 12-15.  Blue Shield's discussion is misleading because it ignores a critical change introduced by the FCC's order issued on February 15, 2012 and the corresponding regulations that became effective on October 16, 2013.  *See In the Matter of the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830 (2012) (the "2012 Order"); 47 C.F.R. § 64.1200(a)(2).

Prior to October 16, 2013, there was no requirement that consent be in writing for any type of telephone call, including telemarketing calls.  Under that regime, FCC orders and judicial opinions held that a consumer providing his or her cell phone number to a business thereby indicated consent for the business to call the

12

1 consumer at that number, as long as the purpose of the call was "closely related" to
2 the purpose for which the telephone number was provided in the first instance.

3     With respect to telemarketing calls, implied consent of that sort was
4 eliminated as of October 16, 2013, when the current version of 47 C.F.R.
5 § 64.1200(a)(2) took effect.  Now, subject to specific exceptions discussed below, if
6 a call made to a cellular telephone (i) "includes or introduces an advertisement or
7 constitutes telemarketing" and (ii) is made "using an automatic telephone dialing
8 system or an artificial or prerecorded voice," then the called party's *prior express*
9 *written consent* is required.[2]  47 C.F.R. § 64.1200(a)(2); *Meyer v. Bebe Stores, Inc.*,
10 2015 U.S. Dist. LEXIS 12060, at *9-13 (N.D. Cal. Feb. 2, 2015).  The FCC rulings
11 and case law cited by Blue Shield for the proposition that supplying a telephone
12 number is sufficient consent either predate October 13, 2013 or relate to calls that
13 did not involve telemarketing, and to that extent do not reflect current law.

14     Because the call from Blue Shield to Plaintiff occurred after October 16,
15 2013, and because that call was made to a cellular telephone using a prerecorded
16 voice and/or an automatic telephone dialing system (it happens to satisfy both
17 criteria), the type of consent required for the call depends on whether the call
18 constituted telemarketing.  If the call made by Blue Shield did *not* constitute
19 telemarketing, then written consent was not required.  Conversely, if the call *did*
20 constitute telemarketing, then it was unlawful for Blue Shield to make the call
21 without first having Plaintiff's prior express written consent.  A middle ground is

---

23 [2] "Prior express written consent" means "an agreement, in writing, bearing the
24 signature of the person called that clearly authorizes the seller to deliver or cause to
be delivered to the person called advertisements or telemarketing messages using an
25 automatic telephone dialing system or an artificial or prerecorded voice, and the
telephone number to which the signatory authorizes such advertisements or
26 telemarketing messages to be delivered."  47 C.F.R. § 64.1200(f)(8).  The written
agreement must also contain certain clear and conspicuous disclosures, including
27 that the person authorizes delivery of "telemarketing calls using an automatic
telephone dialing system or an artificial or prerecorded voice. *Ibid.*

1  also possible at this point:  If resolution of the telemarketing issue comes down to a
2  weighing of evidence, and if a reasonable jury could find either way, then this issue
3  cannot be decided as a matter of law and must be resolved at trial.

4       **B.    "Telemarketing" Under the TCPA**

5       The TCPA regulations provide the definition of telemarketing:  "The term
6  telemarketing means the initiation of a telephone call or message *for the purpose* of
7  encouraging the purchase or rental of, or investment in, property, goods, or services,
8  which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12) (emphasis added).
9  The nature of the "purpose" analysis is illustrated in opinions from both the Ninth
10 Circuit and the Eighth Circuit.

11            **1.    *Chesbro v. Best Buy Stores, L.P.***

12       In *Chesbro v. Best Buy Stores, L.P.*, 705 F.2d 913 (9th Cir. 2012), the plaintiff
13 received two types of prerecorded calls.  One call included a message that notified
14 plaintiff that his reward certificates were about to expire, and stating that plaintiff
15 could re-print the certificates at defendant's website, myrewardzone.com.  *Id*. at
16 916.  The other call summarized certain changes that were being made to the terms
17 and conditions of the rewards program.  *Id*. at 916-17.  The district court granted
18 summary judgment in favor of the defendant, apparently based on a finding that
19 under the TCPA statutes and regulations at issue, the calls could not qualify as either
20 "unsolicited advertisements," "telephone solicitations," or "telemarketing."

21       The Ninth Circuit reversed, and in so doing, articulated two principles
22 relevant to the instant case.   First, the Ninth Circuit held that a caller's
23 characterization of a call as a "courtesy call" or an "informational call" not does
24 answer the question of whether the call constitutes an advertisement or
25 telemarketing.  Instead, the trier of fact must look to the underlying purpose of the
26 message.  *Id*. at 918.  Second, the Ninth Circuit held that calls can violate TCPA
27 telemarketing prohibitions even without an explicit reference to property, goods or
28 services.  *Ibid*.  In that respect, the court noted that some calls urged the plaintiff to

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN                8:16-cv-00108 CJC (KESx)
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1 "redeem" his reward points, and directed him to a website where he could further

2 engage with the reward program.  Based on those facts, and since there was no use

3 for reward points other than to make future purchases, the Ninth Circuit held that the

4 calls "encouraged the listener to make future purchases" and that "[a]ny additional

5 information provided in the calls does not inoculate them" from liability.  *Ibid*.  The

6 court explained that where a call appears to have both an informational component

7 and a marketing component, there is a prohibited purpose if the call is "motivated in

8 part by the desire to ultimately sell additional goods or services."  *Id*. at 917-18,

9 quoting *In re Rules and Regulations Implementing the Telephone Consumer*

10 *Protection Act of 1991*, 18 FCC Rcd. 14014, 14097-98 ¶¶ 140-142 (2003).

11       **2.**     ***Golan v. Veritas Entm't, LLC***

12        The Eighth Circuit reached a similar conclusion in *Golan v. Veritas Entm't,*

13 *LLC*, 788 F.3d 814 (8th Cir. 2015), a case that presented the telemarketing issue in

14 stark terms.  At issue in *Golan* was a marketing campaign for the movie *Last Ounce*

15 *of Courage*, which included placing telephone calls to millions of phone numbers.

16 *Ibid*.  If a recipient answered the call, there followed a prerecorded script promoting

17 the movie.  *Id*. at 817.  If a recipient did *not* answer the call, there followed a

18 prerecorded script stating simply, "Liberty.  This is a public survey call.  We may

19 call back later."  *Id*. at 816, 818.  The *Golan* plaintiffs were among those who

20 received only the abbreviated script.  *Id*. at 818.  The issue was whether calls

21 conveying the abbreviated script constituted telemarketing under the TCPA.

22        The district court dismissed the complaint, holding that the abbreviated script

23 did not constitute telemarketing.  *Id*. at 818.  The Eight Circuit reversed, holding that

24 even though the abbreviated script did not mention the movie, the telephone calls

25 with the abbreviated script nevertheless qualified as telemarketing because, based on

26 the overall context, the ultimate purpose was to promote the movie.  *Id*. at 820-21.

27        Thus, *Chesbro* and *Golan* teach that in determining whether a call constitutes

28 telemarketing, the finder of fact must to evaluate the overall context in which the

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT        8:16-cv-00108 CJC (KESx)

1    call was made, including the underlying motivations of the caller.

2        **C.    Blue Shield's Case Law is Inapposite**

3        As support for its argument that the call at issue here did not constitute

4    telemarketing, Blue Shield relies on *Alleman v. Yellowbook*, 2013 U.S. Dist. LEXIS

5    127212 (N.D. Ill. Sept. 6, 2013).  In *Alleman*, the defendant made a prerecorded call

6    to the plaintiff's residential line to verify receipt of a telephone directory, which was

7    distributed free of charge.  *Id*. at 17.  The district court held that the message did not

8    constitute an "unsolicited advertisement" or a "telephone solicitation" because it did

9    not in any way "advertise[], promote[], contemplate[], allude to[], or encourage[]"

10   the sale of goods or services.  *Id*. at 16-17.  In reaching that conclusion, however, it

11   appears that the court refused to consider anything other than the facial content of

12   the message.  *Id*. at 17 ("*On its face*, the call is not part of a marketing campaign to

13   sell additional products or services." … "The fact that the Yellowbook contains

14   advertisements does not change the call's *facial* character.") (italics added).

15       To the extent the *Alleman* court's holding was the result of considering only

16   the text itself, to the exclusion of surrounding circumstances, it would be

17   inconsistent with the rule that "telemarketing" relates to "the purpose" for which a

18   call was made.  For that reason, the Eighth Circuit declined to adopt the *Alleman*

19   approach.  *See Golan*, 788 F.3d at 820.  This Court should likewise reject it.

20       **D.    A Reasonable Jury Could Find that Blue Shield Made the
21            Telephone Calls at Issue for the Purpose of Encouraging Plaintiff
             and Other Recipients to Purchase a Health Insurance Policy From
             Blue Shield**
22

23       Based on the evidence presented in Section II, Plaintiff believes Blue Shield's

24   purpose in making the calls at issue was to encourage recipients to purchase a health

25   insurance policy from Blue Shield, and thus constituted telemarketing.  The calls

26   were made pursuant to an orchestrated client retention strategy, executed by the IFP

27   *marketing* team, to encourage members to "actively renew," and undertaken with

28   the aim of achieving a 90% retention rate, which would result in premium income

                                      16

1  for Blue Shield.  The script itself was initially drafted so as to refer recipients to the

2  website  URL  blueshieldca.com/renew.     Although  the  final  version  referred

3  recipients  to  the  homepage,  blueshieldca.com,  that  revision  did  not  reflect  any

4  change in the "renewal" purpose of the calls.  Rather, that change was made due to

5  space considerations, along with the fact that the homepage was going to feature a

6  banner through which customers could click for direct access to the renewal tool.

7  Courts have recognized that the mere presence of a website address, without any

8  mention  of  goods  or  services,  can  give  rise  to  a  reasonable  inference  that  the

9  purpose is to draw consumers to explore the website and make purchases.  *See, e.g.*,

10  *Baird v. Sabre Inc.*, Case No. 2:13-cv-0999 SVW (JPR) (C.D. Cal. May 8, 2013),

11  slip op. at 5 (Dkt. No. 18) (Wilson, J.) ("It is easy to infer that inviting consumers to

12  explore one's business in these ways are tantamount to an attempt to acquire their

13  business.").

14          Moreover, when the draft script was circulated, the last sentence of text was

15  "We want to keep you covered."  That sentence was omitted from the final version

16  not because it was inaccurate in any way, but rather to save space.  In addition,

17  when the script was being circulated, the very people charged with finalizing the

18  script and executing the call campaign described the script as "marketing material."

19          The fact that these calls related to potential renewal by existing customers,

20  rather than potential purchases by new customers, does not change the analysis.  In

21  terms of revenue to Blue Shield, it makes no difference whether premium income

22  derives from renewal of an existing policy or from a purchase by a new customer.

23  In either case, the premiums have to be paid.  Cheda Tr. at 136:6-11 (Ex. 2 at 51).

24          Even if, after considering the foregoing evidence, one were to perceive some

25  doubt about the purpose of the calls, at the very least the evidence raises a disputed

26  issue of fact that cannot be resolved on summary judgment.

27

28

## VI. BLUE SHIELD HAS NOT ESTABLISHED THAT, AS A MATTER OF LAW, THE CALL TO PLAINTIFF CONSTITUTED A "HEALTH CARE" MESSAGE

### A.    The Call to Plaintiff Did Not Deliver a "Health Care" Message

Blue Shield next argues that, even if the call to Plaintiff constituted telemarketing, the call delivered a "health care" message such that it would fall within the exception described in the last phrase of 47 C.F.R. § 64.1200(a)(2).  For that exception to apply, the call must deliver a "health care" message "as that term is defined in the HIPAA Privacy Rule, 45 C.F.R. 160.103."  That regulation defines "health care" as follows:

> Health care means care, services, or supplies related to the health of an individual.  Health care includes, but is not limited to, the following:
> (1) Preventative, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body; and
> (2) Sale or dispensing of a drug, device, equipment, or other item in accordance with a prescription.

45 C.F.R. § 160.103 (at definition of "health care").

The prerecorded message sent by Blue Shield does not fit within that definition, and certainly does not do so as a matter of law.  Blue Shield does not point to anything in the message that relates to any sort of "preventative, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care," or any sort of "counseling, service, assessment, or procedure" regarding the physical or mental condition of an individual or that affects "the structure or function of the body," or any sort of connection to "the sale or dispensing of a drug, device, equipment, or other item in accordance with a prescription."  Moreover, there is no warrant for expanding the meaning of "health care" to encompass the call that Blue Shield made in this case.  Blue Shield cites to a 2015 Order in which the FCC granted some leeway to "healthcare providers" with respect to certain TCPA requirements.  *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 Order").  Blue Shield cites that Order

18

1    for the proposition that "the provision of a phone number to a healthcare provider
2    constitutes prior express consent for healthcare calls subject to HIPAA," Def.'s
3    Mem. at 19, but the relief granted by the FCC in that petition does not assist Blue
4    Shield.  First, Blue Shield is not a "healthcare provider."  *See* 45 C.F.R. § 160.103
5    ("healthcare provider" encompasses one who "furnishes, bills, or is paid for health
6    care in the normal course of business.).  Second, in the 2015 Order, the FCC was
7    dealing with petitions that sought relief with respect to "non-telemarketing" calls.
8    2015 Order, 30 FCC Rcd. at 8028-30, FCC 15-72 at 68, 70, ¶¶ 140, 143 (Ex. 22 at
9    275 and 276).  Third, for the reasons described above, Blue Shield's prerecorded
10   call was not about "health care," as that term is defined in the HIPAA regulations.
11   Indeed, the FCC itself expressed doubt that "insurance-coverage" calls could fall
12   within the term "health care."  2015 Order, 30 FCC Rcd. at 8029 & n.473; FCC 15-
13   72 at 69, ¶ 141 (Ex. 22 at 276).

14   **B.    There Is No Categorical "HIPAA Exemption"**

15        At several places, Blue Shield suggests that any telephone call made by any
16   entity that is subject to HIPAA is somehow exempt from the TCPA.  *See* Def.'s
17   Mem. at 8-10, 19-20.  In making that argument, Blue Shield appeals to the 2012
18   Order in which, among other things, the FCC addressed matters relating to "health
19   care related" calls.  In fact, there is no categorical exemption.

20        In the 2012 Order, the FCC repeatedly referred to the fact that it was
21   discussing "health care" calls that are subject to HIPAA.  Within the Order, the
22   discussion is entitled "Exemption for Health-Care-Related Calls Subject to HIPAA."
23   2012 Order, 27 FCC Rcd. at 1852.  The FCC noted that the commenters from the
24   health care industry were supporting a "consent exemption for *health care-related*
25   prerecorded calls subject to HIPAA."  *Id*. at 1854 (italics added).  The FCC
26   explained its rationale by noting that calls covered by the exemption it was granting
27   "are placed by the consumer's *health care provider* to the consumer and concern the
28   consumer's *health*."  *Id*. at 1855 (italics added).  The FCC went on to explain that

19

1   calls within the exemption would not be made to "offer property, goods, or
2   services." *Ibid*.  The fact that the 2012 Order was not intended to enact a categorical
3   exemption for all calls made by any entity that is subject to HIPAA is evident from
4   the regulations that resulted from that Order, which are limited to "health care"
5   messages, *as that term is defined in 45 C.F.R. § 160.103*.  If it were true that every
6   telephone call made by an entity that is subject to HIPAA is exempt from TCPA,
7   there would have been no need for the FCC to address the issue of calls by
8   healthcare providers in the 2015 Order.

9       In any event, even if Blue Shield's expansive interpretation of the 2012 Order
10  were accepted, it would still not be entitled to summary judgment in this case.  That
11  is because the discussion of health care-related calls in the 2012 Order was further
12  limited to "prerecorded calls" made to "residential lines."  *See* 2012 Order, 27 FCC
13  Rcd. at 1853.  The call at issue in this motion was made to Plaintiff's cell phone.

14      **C.    HIPAA Regulations Regarding Use of Protected Health
             Information Have No Bearing on This Case**
15

16      Lacking any good defense under the TCPA, Blue Shield appeals to HIPAA
17  regulations that permit Blue Shield to use "protected health information" without
18  prior authorization for certain "health care operations," other than "marketing."  *See*
19  Def.'s Mem. at 4-5.  Blue Shield's argument goes something like this:  Since Blue
20  Shield was *required* by CMS to mail to Plaintiff the annual open enrollment packet,
21  the mailing of that packet should not be considered "marketing" under HIPAA; and
22  if mailing the open enrollment packet was not marketing under HIPAA, then
23  making auto-dialed, prerecorded telephone calls relating to open enrollment should
24  not be considered "telemarketing" under the TCPA.  *See* Def.'s Mem. at 18-19.

25      That argument is a *non-sequitur*, and seeks to create a conflict between
26  HIPAA and the TCPA where none exists.  Blue Shield was indeed required to *mail*
27  the renewal packet.  No one is contending otherwise.  But Blue Shield has not
28  pointed to any CMS rules that required it to distribute any information via any other

1  method, much less via autodialed, prerecorded telephone calls.  The issue of what

2  sort of activities fall might within or outside the HIPAA definition of "marketing" is

3  simply irrelevant; Plaintiff is not asserting a claim under HIPAA.  Plaintiff is,

4  however, asserting a claim under the TCPA, so the TCPA's definition controls.

5  **VII.  BLUE SHIELD HAS NOT ESTABLISHED THAT, AS A MATTER OF**
**LAW, THE CALL WAS MADE FOR AN "EMERGENCY PURPOSE"**

6

7       As a further back-up argument, Blue Shield argues that the call falls within

8  the TCPA's "emergency purpose" exception.  This is an affirmative defense on

9  which Blue Shield bears the burden of proof.  *Kolinek v. Walgreen Co.*, 2014 U.S.

10  Dist. LEXIS 185000 (N.D. Ill. Aug. 11, 2014).

11       Case law on the issue of what constitutes an "emergency purpose" is sparse.

12  What few cases there are mainly involve calls relating to prescription medication.

13  Blue Shield relies on a single case from the Eastern District of Missouri, *Roberts v.*

14  *Medco Health Solutions, Inc.*, Case No. 4:15-cv-1368 CDP, 2016 U.S. Dist. LEXIS

15  97177 (E.D. Mo. 2016).[3]  *Roberts* involved a claim by a pre-paid cell phone user

16  whose phone number previously had been assigned to a family with three members,

17  each of whom was on prescription medication "important to their continued health."

18  Slip op. at 3.  The child's medication was described as "a must," without which he

19  could "end up in the hospital."  *Id.* at 3.  After receiving calls about prescriptions

20  that obviously were intended for the prior owner of the phone number, plaintiff sued

21  the pharmacy benefits company that made the calls.  In granting the defendant's

22  motion for summary judgment, the district court emphasized that "one of the family

23  members who was the intended recipient of the calls was taking mediations whose

24

---

25  [3] The Lexis version of the *Roberts* opinion contains a printing error that could
potentially cause confusion–the phrase "insurance was needed immediately because

26  he was 'very, very desperate for very expensive medication" is positioned at the end
of page 3, rather than at the end of the first paragraph on page 4.  To eliminate the

27  risk for confusion, plaintiff will cite to the slip opinion, *Roberts v. Medco Health*
*Solutions, Inc.*, Case No. 4:15-cv-1368 CDP (E.D. Mo. July 26, 2016), Dkt. No. 76.

28

1    absence would have significantly impacted his ongoing health." Slip op. at 7.

2         It is unclear why the *Roberts* court chose to rely on the "emergency purpose"

3    provision rather than the exception that the FCC has provided for prescription

4    notifications and other calls "for which there is exigency and that have a healthcare

5    treatment purpose." *See* 2015 Order, 30 FCC Rcd. at 8031-32. In any event, unlike

6    *Roberts*, the calls at issue in the instant case do not involve critical prescription

7    medications. Thus, even if that court's application of the emergency purpose

8    exception was correct under the facts presented there, nothing in *Roberts* explains

9    why the emergency purpose exception should be applied in the instant case.

10        Two years before *Roberts*, a district judge in the Northern District of Illinois

11   dealt with a similar issue involving calls that encouraged consumers to refill

12   prescriptions at Walgreens. In *Kolinek v. Walgreen Co.*, 2014 U.S. Dist. LEXIS

13   185000 (N.D. Ill. Aug. 11, 2014), the court rejected the argument that the

14   emergency purposes exception necessarily applies just because a call is somehow

15   related to a prescription. *Id.* at *3.

16        Given the dearth of case law, the most useful guidance comes from the FCC

17   material. The FCC has described the emergency purpose exception as being

18   "limited" in scope. *In the Matter of Implementation of the Middle Class Tax Relief*

19   *& Job Creation Act of 2012*, 27 FCC Rcd. 13615, 13628–29 (2012). The FCC

20   recently granted a limited exemption for autodialed calls by educational

21   organizations to student family telephones related to "weather closures, incidents of

22   threats and/or imminent danger to the school due to fire, dangerous persons, health

23   risks (e.g., toxic spills) and unexcused absences." *In the Matter of Rules &*

24   *Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 31 FCC Rcd. 9054,

25   9062-63 (July 8, 2016). The FCC explained that a telephone call or message about

26   an unexcused absence can "alert [a parent] to a situation potentially implicating the

27   health and safety of an unaccounted-for child…." *Id.* at 9063. The FCC has also

28   held that calls made pursuant to the Warning Alert and Response Network (WARN)

22

1  Act are made for an "emergency purpose." *See* 2012 Order, 27 FCC Rcd. at 1837;

2  FCC, *Wireless Emergency Alerts* (WEA) (Ex. 23 at 278).  Such alerts cover only

3  alerts issued by the President, alerts involving "imminent threats to safety or life,"

4  and Amber Alerts.  In the context of public utilities, the FCC has recognized that the

5  emergency purpose exception applies to calls warning of "[s]ervice outages and

6  interruptions in the supply of water, gas or electricity" that pose potentially

7  hazardous conditions to the public health and safety.  *In the Matter of Rules and*

8  *Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC

9  Rcd. 8752, 8778 (1992).  These references demonstrate that the FCC has never

10  applied the emergency purpose exception to a situation similar to the instant case.

11      The notion that the calls at issue here were "necessary" due to an

12  "emergency" is inconsistent with the evidence.  Blue Shield's marketing team had

13  been planning these calls since at least as early as June 2015.  Moreover, even if a

14  customer did not take the step of actively renewing through the Blue Shield website,

15  the insurance policy would nevertheless renew for the following year.  Def.'s Mem.

16  at 1.  A reasonable jury could easily find that there was no emergency.

17  **VIII.  THIS COURT HAS ARTICLE III JURISDICTION**

18      **A.    The Invasion of a Privacy Right Resulting From a TCPA Violation**
19            **Constitutes a "Concrete" Injury for Article III Standing**

20      Blue Shield's final argument is that Plaintiff lacks Article III standing.  The

21  crux of the argument is that any violation did not result in a "concrete" injury

22  because Plaintiff "paid a monthly charge for an unlimited number of minutes" and

23  therefore she "did not incur a separate or incremental charge for the call at issue."

24  Def.'s Mem. at 25.  This argument fails for several reasons.

25      First, the notion that Article III requires an out-of-pocket loss is untenable.  In

26  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), the Supreme Court affirmed that

27  "concrete injury" can be satisfied by either tangible or intangible injuries.  In

28  determining whether an intangible injury is concrete, courts consider (1) "whether

1    [the] intangible harm has a close relationship to a harm that has traditionally been

2    regarded as providing a basis for a lawsuit"; and (2) the judgment of Congress in

3    "identifying and elevating" the intangible harm to the status of "[a] legally

4    cognizable injur[y]" that gives rise to a case or controversy." *Spokeo*, 136 S. Ct. at

5    1549.   By enacting the TCPA, Congress intended to curb the receipt of

6    telemarketing calls "that by their nature invade the privacy and disturb the solicitude

7    of their recipients." *Aranda v. Caribbean Cruise Line, Inc.*, 2016 U.S. Dist. LEXIS

8    111828, at *19 (N.D. Ill. Aug. 23, 2016).

9      Second, there is a fundamental distinction between the procedural violation

10    alleged in *Spokeo* and the violation of substantive privacy rights at issue here.   In

11    *Spokeo*, the plaintiff alleged violation of the Fair Credit Reporting Act of 1970, 15

12    U.S.C. § 1681 *et seq*., and in particular statutory provisions that require consumer

13    reporting agencies to "follow reasonable procedures to assure maximum possible

14    accuracy" of consumer reports.   *Spokeo*, 136 S. Ct. at 1545.   In that context, the

15    Supreme Court held that, if the violation of a statute conferring a procedural right

16    might—but also might not—cause a harm or material risk of harm identified by

17    Congress, it is not sufficient to allege merely that the statute was violated.   The

18    Supreme Court remanded for the Ninth Circuit to further evaluate whether there is

19    "concrete" injury in that case.   In contrast, the TCPA establishes *substantive* privacy

20    rights "to be free from telemarketing calls consumers have not consented to

21    receive."   *Aranda*, 2016 U.S. Dist. LEXIS 111828, at *19 -20; *see also Cour v.*

22    *Life360, Inc.*, 2016 U.S. Dist. LEXIS 98945, at *2 (N.D. Cal. July 28, 2016).[4]

23

_____

24    [4] The overwhelming weight of post-*Spokeo* authority supports the position that the

25    invasion of a privacy right protected by the TCPA satisfies the "concrete injury" element for Article III standing.  *See, e.g.*, ; *Lavigne v. First Cmty. Bancshares, Inc.*,

26    2016 U.S. Dist. LEXIS 144741, at *11-23 (D.N.M. Oct. 19, 2016); *Krakauer v. Dish Network, L.L.C.*, 2016 U.S. Dist. LEXIS 111090, at *5-6 (M.D.N.C. Aug. 5,

27    2016); *Hewlett v. Consol. World Travel, Inc.*, 2016 U.S. Dist. LEXIS 112553 (E.D. Cal. Aug. 23, 2016); *Booth v. Appstack, Inc.*, 2016 U.S. Dist. LEXIS 68886, at *5

28    (W.D. Wash. May 25, 2016); *Mey v. Got Warranty, Inc.*, 2016 U.S. Dist. LEXIS (footnote continued)

| PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT | 8:16-cv-00108 CJC (KESx) |

For the foregoing reasons, the two cases on which Blue Shield relies, *Romero v. Dept. Stores Nat. Bank*, 2016 U.S. Dist. LEXIS 110889 (S.D. Cal. Aug. 5, 2016) and *Sartin v. EKF Diagnostics, Inc.*, 2016 U.S. Dist. LEXIS 86777 (E.D. La. July 5, 2016) should not be followed.  *See, e.g., Juarez v. Citibank, N.A.*, 2016 U.S. Dist. LEXIS 118483, at *6-8 (N.D. Cal. Sept. 1, 2016); *Lavigne*, 2016 U.S. Dist. LEXIS 144741, at *19-20 (describing *Romero* as an unconvincing, draconian analysis that ignores the existence of intangible harms recognized in the legislative history and in the case law); *A.D. v. Credit One Bank, N.A.*, 2016 U.S. Dist. LEXIS 110393, at *20-21 (N.D. Ill. Aug. 19, 2016) (rejecting the reasoning of *Sartin*).

### B.   If This Court Does Lack Article III Jurisdiction, the Procedural Result Would Be Remand to State Court

If the Court were to find a lack of Article III standing, that would not justify entry of judgment.  Rather, a lack of subject matter jurisdiction would require remand to the Orange County Superior Court.  28 U.S.C. § 1447(c); *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 87-89 (1991); *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016).

## IX.   CONCLUSION

Based on the foregoing, the motion for summary judgment should be denied.

Dated: December 12, 2016          DOSTART HANNINK & COVENEY LLP


                                   /s/ James T. Hannink
                                   _____
                                   JAMES T. HANNINK
                                   Attorneys for Plaintiff

781431.6

_____

84972, at *4-24 (N.D. W. Va. June 30, 2016); *Rogers v. Capital One Bank (USA), N.A.*, 2016 U.S. Dist. LEXIS 73605, at *3-6 (N.D. Ga. June 7, 2016); *Ung v. Universal Acceptance Corp.*, 2016 U.S. Dist. LEXIS 102363, at * 6-7 (D. Minn. Aug. 3, 2016); *Griffith v. ContextMedia, Inc.*, 2016 U.S. Dist. LEXIS 144653, at *4-7 (N.D. Ill. Oct. 19, 2016).